*68 The opinion of the court was delivered by
Gibson, C. J.
r-In the case stated, it is admitted that the plaintiff in error committed the assault of which he is indicted, on board a brig lying beyond-low-water mark at Flintham's wharf:- so that the question depends on whether the jurisdiction of .the Mayor’s Court extends beyond the margin of the river.
■ On this little can be said in the way of argument; for nothing in.the act of incorporation or the supplementary acts, has a direct bea'ring.on it, or was intended to be predicated of it; and the construction, therefore, is in a great degree to be directed by expediency. The compact between Pennsylvania and Jersey, Which, subject to certain limitations, secures to each a common jurisdiction of offences committed on the Delaware, relates exclusively to state jurisdiction, and cannot-settle, a- question of jurisdiction between places in the same state.' The incorporating act of 17S8, declares, that “the inhabitants of the city of Philadelphia, as the same extends and is laid out, between the rivers Delaware and Schuylkill,” shall be constituted a corporation. That the city had been laid out between these rivers, is no doubt, directly affirmed; but how far it extends, is left as much in the dark as ever. This act has reference to the charter of William, Penn, in which nearly the same words are used; . But Mr,. Penn expressly recognises the jurisdiction- of the city, over, the port by authorizing the citizens “ to build wharves so far out into the river there, as the mayor, aldermen, and common council hereinafter mentioned shall see meet.” Again: — “ The said city of Philadelphia,” is declared to be- “ a port or harbour for discharging and 'tinlading of goods and merchandizes out of ships and' boats and other vessels; and for lading and shipping them, in or upon such and so many places, quays, and wharves, as by the mayor, aldermen, and common council of the.said- city, shall, from time to time, be thought most expedient for the accommodation and service of the. officers of the'customs, and management of'the king*s affairs and preservation of his duties, as. well as of conveniency of Trade.” Now, exclusive of the inference to be drawn from the words city and port being used as convertible terms, from which it may well be supposed that the port, as' now established by congress, was not then considered as a subject of separate jurisdiction; it is evident that Philadelphia Was then v.iewed as destined to become .what it afterwards was, the commercial emporium of America. Is it to be credited then, that a statesman so sagacious, as-William Penn should have' intended to put beyond the control of a-city j founded almost exclusively for commercial purposes, the very fountain of its commercial prosperity? The regulation of. commerce on the land was expressly committed to the authorities of the'eity; and it is unwarrantable to suppose that the same authorities were thought to be incompetent to provide ordinances for *69 the government of vessels lying in the stream. Undoubtedly, the entire subject of commerce, with ,all its incidents, was committed to those who were most directly and most deeply interested'in it; and who would,- therefore, be most competent to manage it successfully for the public good. That the subject was so viewed by William Penn, would seem to be fairly deducible from his declaration in the charter, that the port or harbour of Philadelphia should extend “ into all such creeks, rivers, and places within this province, and shall have so many wharves, quays, landing-places, and members belonging thereto, for landing and shipping of goods, as the said mayor, aldermen, and common council, for the time being, with the approbation of the chief officer or officers of the king’s customs, shall, from time to time, think fit to appoint.”
Such, then, being the limits assigned to the city by William Penn, and recognised by the incorporating act of 1788, where do we find a legislative -provision tending to narrow them ? The act for dividing the city into wards, is undoubtedly restrained to the land. But that act was passed with a view,to a division rather of the inhabitants than the territory, and it would have been strange had its provisions been applied to territory where there were no inhabitants to divide.
But I am governed more by considerations of expediency, if not absolute necessity, than by positive provisions in favour of the jurisdiction. For what beneficial purpose ascribe to the county authorities jurisdiction of the port, the transactions of which are exclusively commercial and inseparably connected with the city? A power to make ordinances for removing obstructions of the navigation and the causes of contagion, is essential, not only t-o. the prosperity, but the existence of the inhabitants. These cannot be supplied by the county authorities; nor, if it were otherwise, would a remedy adequate to the exigency of the occasion be provided by men who have no particular interest in the subject. It would be an unsufferable -annoyance and altogether destructive of order and the administration of the laws, if in putting his .foot into a lighter, any pne might set the ordinances of the city at defiance. And it would be a source of perplexity and endless litigation, if it were permitted to be máde a subject of debate whether any transaction had happened within or beyond the point of low-water mark. To cut up all difficulties of this sort by the roots, we pronounce it to be our unanimous opinion, (and, also, to have been that of our late brother, Mr. Justice Duncan, whose loss since the argument we have to deplore,) that the jurisdiction of the city authorities extends to the Jersey shore, subject, of course, to the limitations contained in the compact between the two states.
. Tod, J., took no part in the decision, not having heard the argument. .
Judgment affirmed.